705 So.2d 1142 (1997)
STATE of Louisiana
v.
Donald TIPTON.
No. 95 KA 2483.
Court of Appeal of Louisiana, First Circuit.
December 29, 1997.
*1144 Anthony G. Falterman, District Attorney, Donald D. Candell, Assistant District Attorney, Donaldsonville, for State of Louisiana.
Sheila C. Myers, New Orleans, for Defendant-Appellant Donald Tipton.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
LOTTINGER, Chief Judge.
Defendant, Donnie Tipton, was charged by grand jury indictment with the second degree murder of Danny Cotton. La. R.S. 14:30.1. Following a trial by jury, defendant was found guilty as charged. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence and with credit for time served. Initially, on appeal, defendant failed to file an appellate brief with this court, which limited our review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. Finding no such errors, we affirmed the conviction and sentence. Defendant applied for a rehearing, which we granted. On rehearing, defendant briefed five assignments of error.
Danny Cotton, the victim, and Denise Cotton were married on February 25, 1993. Denise is the half-sister of defendant. On October 13, 1993, the day the victim was shot and killed, he and Denise were involved in a fight at their mobile home. At shortly after 6:00 p.m., in response to a call from the victim that there had been a disturbance and that Denise was cutting her wrists, Ascension Parish Deputy Sheriff Bill Taylor went to the residence. Denise indicated to Taylor that she wanted to spend the night somewhere else and that, although her parents had a peace bond against her, she would try to stay at her parents' home. Taylor took her there. Defendant was at the parents' home when Taylor and Denise arrived. After the parents refused to allow Denise to stay with them, defendant also indicated an unwillingness to let her stay with him; but, thereafter, defendant stated that he would allow her to stay with him and that they would probably go to Ray Wallace's home, across the street. At that point, about 7:00 p.m., Taylor left the location, feeling that everything was under control. Denise and defendant went to Wallace's residence, entered the home and turned on the lights. Defendant apparently became very emotionally upset when he saw Denise's injuries in the light. Defendant picked up Wallace's 12 gauge pump shotgun and got into defendant's vehicle bound for the Cottons' home. Denise got into the vehicle too. When defendant and Denise got to Li'l Pals' Grocery Store, he forced Denise out of the car. From the store, Denise phoned the victim to warn him defendant was on his way. During the phone call, the victim said: "[h]e's here" and "[o]h, God." Thereafter, there was no one on the phone. Denise then called the Ascension Parish Sheriff's Office. The call was received shortly after 8:00 p.m. In response, Deputy Sheriff Taylor went to *1145 Li'l Pals' Grocery Store, picked up Denise and proceeded to the Cottons' residence, where they found the victim lying outside on the ground shot. The victim had sustained wounds from four shotgun blasts and died as a result of his heart and lungs having been penetrated by shotgun pellets. At the time of the shooting, Roma Allen was visiting his mother, who lived close to the Cottons; and he identified defendant as the shooter. The police arrested defendant at his mother's home shortly after the shooting.
According to Denise Cotton, the first time defendant saw her in the light on October 13 was when they turned on the light inside Ray Wallace's house. It was then that defendant saw she was beaten up. Denise stated that defendant "just kind of went into a rage" and was "[u]ncontrollable." Defendant said words to the effect that she "had been beat[en] up so many times" that he could not take anymore. Denise tried to calm defendant down, but nothing worked. Her efforts to prevent him from leaving Ray Wallace's house and taking the shotgun with him were also unsuccessful. Inside defendant's car, she pleaded with defendant, begged him and tried to talk to him; but he kept getting madder and "going nuts."
Denise Cotton testified that it normally took about fifteen minutes to drive from Ray Wallace's house to her home, traveling within the speed limit. However, according to her, on the night of the shooting, defendant was driving at a very fast speed. When defendant stopped at Li'l Pals' Grocery Store, the car came to a "screeching stop." Threatening to "beat the shit out of [her]," defendant forced her out of the car. She phoned the victim, because "[e]verything was coming down" and she was scared to death.
Denise testified that she had no knowledge of any contact between defendant and the victim on the day of the shooting, with the exception of the shooting itself. Nor did she have knowledge of any words or argument between defendant and the victim that day.
Regarding the beating inflicted upon her by the victim on the day of the shooting, Denise stated that he "tore [her] up pretty good." During the beating, she jumped up, grabbed a razor and said: "If you're going to kill meif I'm going to die, I'll kill myself." She then slit her wrists and suffered severe bleeding. She received bruises. Her clothes were torn, and her hair was "jerked out."
Denise testified that this beating was not the first one administered to her by the victim. The victim actually started beating her in July or August of 1992. In June of 1993, the victim pulled her elbow out of the socket after the birth of her baby. Denise stated that, "right after" she came home from the hospital with the baby, the victim threw her out of their trailer into a shed at the back door. She was naked and had to run to a neighbor's house. This was one of several instances when she was literally thrown out of her home by the victim. According to Denise, the whole family knew about these instances. Denise stated that she related to defendant the various instances of her having been physically accosted by the victim and that defendant also witnessed some additional incidents. Denise testified that she once testified against the victim in court concerning the "trials and tribulations that [she] went through" and that as a result of her testimony the victim was found guilty.
Deputy Taylor testified that, when he went to the Cottons' residence on October 13 at about 6:00 p.m., the disturbance between the Cottons was "pretty much over." Taylor stated that Denise Cotton did not tell him she had been severely beaten. She was "a little upset" but not hysterical. At the trailer, Denise mentioned to Taylor that the victim had pushed her and struck her. Taylor did not see any injuries to her other than to her wrists, which he described as "just minor scratches." Denise did not want any medical treatment and stated that she would not cut her wrists anymore. Consequently, Taylor took no further steps concerning her injuries.
Taylor testified that, when he went to the parents' residence and spoke to defendant, he explained to defendant the situation of the earlier fight or argument between the victim and Denise. Upon hearing the explanation, defendant did not go into a rage. Instead, defendant's reaction was "this is the same old thing over and over again."
*1146 Melissa Findly, defendant's mother, testified that she never saw Denise Cotton being beaten by the victim but she has seen the results of the beatings, i.e., bruises, "the busted lip," black eyes and Denise's elbow "pulled out of joint." Denise was "always bruised." According to Melissa, the incidents occurred "weekly, bi-weekly, whenever [the victim] chose." There were times when Melissa related to defendant the results of beatings Denise suffered from the victim. Melissa testified that, while Denise's baby was awaiting its release from the hospital, two days after Denise's arm was dislocated, Melissa got a call from Denise informing her that the hospital would not release the baby if the baby was going to live with the victim.
Defendant took the witness stand and testified in his own defense. He stated that he had never witnessed the victim beating Denise but that he had witnessed the results of such beatings, i.e., "[h]er face beat[en] in, busted lips, choke marks, black coke [sic] marks on her neck, her arm jerked out of place, [and] her knees skinned up where [the victim] knocked her down on the cement, several times." He was present on occasions when Denise and the victim got into arguments, and he would try to get them to settle those arguments. Defendant stated that he and the victim had never had any physical altercations. He also stated that the matters Denise testified she had related to him were in fact related to him.
Defendant testified that he was at his mother's home on the night of October 13, 1993, when the deputy drove up with Denise in his car. The deputy told him Denise was "beat[en] up" and had no place to go. When defendant took Denise to Ray Wallace's home and turned on the lights, defendant looked at Denise and saw she was beaten and bleeding from both wrists. Denise was crying and telling defendant she "couldn't go on no [sic] more, and that she couldn't get away from [the victim]." Defendant got "mad, real mad," exited Wallace's home with the shotgun, got into his car and proceeded to the Cottons' residence. Denise got into the car with defendant and was yelling at him before he stopped at the traffic light. He told her to get out of the car, shoved her out and continued alone to the Cottons' residence. When defendant arrived there, the victim was looking out the window. Defendant testified that he "just shot through the window." The victim kicked open the back door to his residence and came out. Defendant then "shot in that direction." Although he did not recall whether he fired a total of three or four shots, defendant indicated that the victim was running from him when the victim exited the back door.
Defendant admitted during his cross-examination that his intention was to kill the victim. He stated that he was out of his mind, "shook up, mad, pissed," when he went to the victim's residence. Defendant testified that he had never previously been that mad at the victim but that the victim had never previously driven Denise to the point that she had attempted suicide. He further testified that he had "had enough of [the victim]."
Defendant testified that he remembered leaving the Cottons' home and driving back to Ray Wallace's home, putting away the shotgun and driving to his mother's home. Defendant stated that he went to her home to tell her what he had done and that he would be going to jail. He just wanted to sit there and talk to her until the police came.

ASSIGNMENT OF ERROR NO. 1
In this assignment, defendant contends that the trial court erred by refusing to allow him to introduce into evidence certain testimony of Denise Cotton and a photograph during her cross-examination, as to which he was permitted to make two proffers. Defense Proffer No. 1 consisted of Denise Cotton's testimony that, while her baby was in the hospital during the thirteen-week period the baby was hospitalized following its premature birth, she and the victim went to the hospital to visit the baby. While Denise was at the hospital sitting in a rocking chair holding the baby, the victim (who was intoxicated) walked in the room and kicked the rocking chair, which threw her forward with the baby. The victim was saying he was going to tell the baby what a bitch the baby's mother was. The incident was witnessed by about five or six other persons, and the victim *1147 was then escorted from the room. Defense Proffer No. 2 included a color photograph approximately 3 1/2 X 4 1/2 inches. As part of the proffer, Denise Cotton testified that she could identify the photograph. She testified that it depicts her and her son and an area of her head from which her hair had been pulled out. She stated that the picture was taken after one of the incidents when the victim "jerked a bunch of [her] hair out" in September of 1993 during a fight with him.
Defendant asserts that the court's rulings disallowing the introduction of the proffered evidence precluded him from showing the complete history of assaultive behavior by the victim against Denise Cotton. Defendant argues that the cumulative effect of that complete history, including the beating Denise Cotton sustained at the hands of the victim on the day of the shooting and her attempted suicide in response to that beating, coupled with his viewing the extent of Denise Cotton's injuries at Ray Wallace's home shortly before the shooting, provided the provocation which caused him to kill the victim in sudden passion or heat of blood. Defendant asserts that the complained of rulings denied him his constitutional right to due process and right to present a defense by showing his conduct in shooting the victim was an act committed in sudden passion or heat of blood, reducing what would have been second degree murder to the lesser included responsive offense of manslaughter.
In disallowing introduction of the proffered evidence, the trial court concluded that this evidence was repetitious of evidence already introduced. The rationale of the court in reaching this conclusion, as reflected in statements made by the court during objections by the prosecutor to evidence regarding the victim's assaultive behavior against Denise Cotton was that, although the evidence was inadmissible character evidence under La. Code Evid. art. 404, the court was permitting introduction of such evidence by the defense, because the state had opened the door to introduction of such evidence by presenting evidence of the assaultive behavior during the direct examination of Denise Cotton. We concur in the conclusion and rationale of the trial court, since the record is replete with evidence of the victim's assaultive behavior directed against Denise Cotton. The proffered evidence would have been duplicitous and, thus, was properly excluded. Clearly, there was no denial of the constitutional rights to due process and to present a defense as claimed by defendant.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 2, 3 & 4
In assignments 2 and 3, defendant contends that the trial court erred by failing to instruct the jury that "sudden passion" and "heat of blood" are mitigatory factors that diminish culpability and reduce a murder to manslaughter and that the accused's burden of proof as to the existence of those factors was by a preponderance of the evidence rather than beyond a reasonable doubt. In assignment 4, defendant contends that the trial court erred by refusing to give additional instructions to the jury defining the term "rage," when the jury requested that definition during its deliberations on the verdict.
Erroneous jury instructions or failures to give jury instructions are not errors patent and, absent a contemporaneous objection, a defendant may not complain on appeal of an allegedly erroneous jury charge or the failure to give a jury instruction. See La. Code Crim. P. arts. 801, 841 and 920(2); State v. Bacon, 578 So.2d 175, 179 (La.App. 1st Cir.1991), writ denied, 93-0694 (La.3/30/95); 651 So.2d 857; State v. Jeanlouis, 96-474, p. 12 (La.App. 3d Cir. 11/6/96); 683 So.2d 1355, 1363, writ denied, 96-2822 (La.4/18/97); 692 So.2d 446 (a case in which the appellate court found the defendant's failure to object to the denial of the jury's request for further instructions operated as a waiver). Even if an instruction is fundamentally erroneous, for the objection requirement to be waived, the defendant still must establish on appeal that the failure to object was excusable and not the result of trial strategy. State v. Mart, 419 So.2d 1216, 1219 (La.1982). Herein, the record does not reflect that defendant made a contemporaneous objection to the jury charges on the basis of the alleged failures now urged in assignments *1148 2 & 3 and to the court's refusal to define "rage" urged in assignment 4. Indeed, defendant acknowledges the absence of any objections; and he does not even attempt to meet the burden placed upon him by Mart. Accordingly, the issues raised in these assignments were not properly preserved for our review.
These assignments lack merit.

ASSIGNMENT OF ERROR NO. 5
In this assignment, defendant contends that the evidence was insufficient to support his conviction of second degree murder and, therefore, the trial court erred in denying his motion for post verdict judgment of acquittal. Defendant asserts that, viewing the evidence in the light most favorable to the state, a rational trier of fact could not have been convinced beyond a reasonable doubt that the defense did not prove defendant committed this homicide in sudden passion or heat of blood.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original). See also La.Code Crim. P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
The applicable definition of second degree murder in this case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific criminal intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be proved by direct evidence such as statements by a defendant, or by inference from circumstantial evidence, such as defendant's actions or facts depicting the circumstances. State v. Huls, 95-0541, pp. 25-26 (La.App. 1st Cir. 5/29/96); 676 So.2d 160, 177, writ denied, 96-1734 (La.1/6/97); 685 So.2d 126.
In this case, defendant does not contest the existence of his specific intent to kill the victim. Indeed, during his trial testimony he admitted his intent was to kill the victim.
Accordingly, we now must determine if the circumstances indicate the crime was actually manslaughter as defendant contends. Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106, 110 (La.1986). The state does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Lombard, 486 So.2d at 111. In reviewing the claim, this court must determine if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence. Lombard, 486 So.2d at 111.
The jurors were aware of the possibility that they could return a responsive verdict of guilty of manslaughter. However, the jury verdict of guilty as charged demonstrates that the jury concluded either: (1) that there was not sufficient provocation to deprive an average person of his self-control and cool reflection, or (2) that an average person's blood would have cooled by the time defendant shot the victim.
We have carefully reviewed the record and find that the evidence supports the jury's determination that this was a case of second degree murder. We are convinced that, when the evidence is viewed in a light most *1149 favorable to the state, a rational trier of fact could have concluded beyond a reasonable doubt that defendant committed second degree murder and not manslaughter.
For the above reasons, this assignment is meritless.
CONVICTION AND SENTENCE AFFIRMED.