I, STEWART, J.
The defendant, Edward James McKinney (“McKinney”), was found guilty in a jury trial of second degree murder and was sentenced to life without benefit of parole, probation, or suspension of sentence. McKinney appeals citing error in the jury instructions and insufficiency of the evidence. However, for the reasons that follow, we affirm his conviction and sentence.
FACTS
On September 1, 2002, Tatum Strogen (“Strogen”) went to the Expo Hall in Shreveport to attend a rap concert with her cousin and group of young ladies. But after it was announced that the performer *739 was going to arrive very late, Strogen’s group went out into the parking lot to leave.
When they got to the parking lot, they witnessed a verbal altercation between Eu-tychus James (“James”) and Barandle Williams (“Williams”), who were from rival gangs. Williams was a member of the Bloods, and James was a Crip. As the men argued, other members of both gangs stood watching. When one of the Bloods brandished a semi-automatic pistol, another Blood tried to calm both sides down telling them that there were too many people out there for anyone to be shooting.
However, another member of the Bloods, Kevin Capers (“Capers”), fired a shot into the air. Immediately, people on the Crips’ side began firing. Strogen’s group, which was near the Bloods’ gang, ducked down by a police car. However, during a lull in the shooting, Strogen got up to run back inside the building and was struck in the head with a bullet. She died the following morning.
|2The evidence established that the Crips were on the west side of the parking lot and the Bloods were on the east side. After the shooting, 40 shell casings were found. Of these, 39 were found on the west side.
The investigation led to McKinney. He gave a statement in which he said that he went to the Expo Hall with a group of men from his neighborhood. McKinney stated that when the shooting began, he became paranoid and grabbed a weapon from James and shot in self-defense. He admitted that he fired eight or nine shots from a 9-millimeter pistol with a short clip.
Several weapons were recovered during the investigation. Three were identified as those that were taken to the Expo Hall by the people in McKinney’s group. One was an assault rifle and the other two were 9-millimeter Rugers. A ballistics test showed that the bullet retrieved from Strogen’s head had been fired from the 9-millimeter Ruger with a short clip.
One of the state’s witnesses, Rodreaco Lafitte (“Lafitte”), was given immunity from prosecution in exchange for his testimony. His testimony included identification of the people who went with McKinney, the weapons each possessed, and what happened after the shooting. He testified that McKinney had told him he had shot Eutychus James’ gun. He also admitted that he was the owner of the 9-millimeter Ruger with an extended clip.
The defense called two witnesses. Rodney Lewis (“Lewis”), who had been housed at Caddo Detention Center with McKinney, stated that he saw Brodrick Johnson (“Johnson”) shoot the victim. However, on crossjexamination3 he admitted that he did not mention this fact to the investigators when he was questioned the day after the shooting two years earlier.
The other defense witness was Eutychus James who testified that the gun McKinney took from him was a chrome gun, and not the 9 millimeter Ruger. The state rebutted this testimony by presenting the videotape of James’ earlier statement to police which directly contradicted his testimony at trial. Following the trial, McKinney was found guilty of second degree murder and sentenced to life in prison without the possibility of parole, probation, or suspension of sentence. This appeal ensued.
DISCUSSION

Insufficiency of Evidence

McKinney argues that the absence of anyone testifying that he or she saw him fire the murder weapon coupled with the defense witness who testified that McKinney fired a different weapon makes the *740 evidence insufficient to support the conviction.
The state argues that the evidence supports a finding by the jury either that the defendant was the person who fired the fatal shot or that he was a principal to the crime. Second degree murder is defined by La. R.S. 14:30.1,
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by 14shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
The testimony established that McKinney went to the Expo Hall with a group of people from his neighborhood. It was also established that three people, Israel Edwards (“Edwards”), Eutychus James, and Derrick Morris (“Morris”), brought guns with them. All of the witnesses who were at the scene during the shooting testified they heard an argument between two men and there was yelling and profanity. The record reveals that the two men arguing were Eutychus James and Barandle Williams and that they were members of rival gangs.
The record shows that some of the witnesses from both groups saw Williams take a TEC-9 out of the trunk of a car. A member of the Bloods, Tim Knowles, tried to get both sides to back down and not use weapons. Nonetheless, another member of the Bloods, Kevin Capers, fired his pistol into the air.
McKinney did not see the gun being fired and did not feel any bullets near him, but he grabbed James’ gun and opened fire. In his statement he admits that he fired 7 or 8 rounds, but the investigators recovered 15 cartridges from the gun believed to have been used by McKinney.
The weapons admitted into evidence were an Intratec 9-millimeter pistol, a Lorcin .380, a chrome Ruger .09, a black Ruger .09, and an assault rifle. The ballistics findings show that the bullet lodged in Strogen’s brain was fired from the black Ruger 9-millimeter. The audiotape of McKinney’s | ¡¡statement was also entered into evidence. He indicated that Edwards had a gun with a 30-inch clip, Morris had a rifle with a banana clip and that he “just had the short clip.”
Lafitte testified that he, Lorenzo Ealy, Morris, and McKinney rode together in Ealy’s vehicle. He testified that he brought his 9-millimeter Ruger with an extended clip with him and gave it to Edwards. He further testified that Morris “had the AK.” He testified that James had a black 9-millimeter Ruger with a regular clip. He also testified:
Q. Now, at some point during that night, Edward McKinney got this gun from James. Right?
A. Yeah.
Lafitte’s sister, Jotasha, testified that McKinney was with the group of guys who came to her house after they had been to the Expo Hall. She said that McKinney had a shirt wrapped around his hand and went into the house.
During her testimony, she identified the guns that were left at the house that night *741 as, “One was a — they call it a chopper. I know one was my brother’s gun. It was a Ruger. And another black gun.”
She also viewed the photograph of the weapon that had been admitted into evidence and identified it as her brother’s gun. She questioned whether it was the correct clip in the following exchange:
A. Yes. But I don’t think it is the clip.
Q. Now, did your brother have an extended clip:
A. Yes.
Q. Okay. Did you want to see the clip itself:
A. Yeah.
(Deputy displays the extended clip.)
A. That’s it.
Q. Okay. That looks — that’s your brother’s gun.
| (A- Uh-huh.
Q. And the clip?
A. Yes.
However, James, testifying for the defense, stated that the gun McKinney grabbed was actually the Ruger with the long clip. This testimony contradicted a prior statement he gave to the police. Specifically, in the prior videotaped statement, James had said that he was the only person that shot his “chopper” that night. He said he fired it two times and then put it on the backseat of the vehicle. He stated he did not know what had happened to it after that night but that he thought Rodreaco Lafitte might know where it was. The contradiction in statements could lead a reasonable juror to disregard his testimony.
Thus, the record supports a finding that McKinney took the black Ruger from James and fired it. The evidence that he was standing beside a car and a corner of the building supports a finding that he could have taken cover instead of firing into the crowd thus eliminating the mitigating factor of self defense.
In his statement McKinney admitted that, “I stopped shooting, I jumped in the car, and we left.” Further, McKinney’s argument that the state did not present evidence of his fingerprints on the weapon or that James’ testimony shows he fired a chrome pistol that was not the murder weapon would not negate the conviction. Moreover, we agree with the prosecution’s argument that the doctrine of principals is also sufficient to support McKinney’s conviction and sentence. The evidence clearly shows that not only was McKinney with a group of people who fired the fatal 17bullet, but that he was one of those who shot indiscriminately into the crowd. The only other possible theory on which to negate McKinney’s culpability was the defense’s theory that a lone gunman came from the east side of the building and fired the fatal shot. The defense attempted to establish this theory through the testimony of Lewis. However, the jury apparently doubted Lewis’ credibility. The record reveals that Lewis did not disclose any information about another gunman when he was questioned two years earlier. Moreover, his theory contradicted the forensic evidence. If a person had actually fired the shot from the east side of the building, the victim’s wound would have been on the left side of her head instead of the right. Additionally, the ballistics tests matched a recovered weapon, purportedly fired by the defendant, to the bullet found in the victim. Thus, the evidence was sufficient for a reasonable juror to find the defendant guilty of second degree murder. Consequently, this assignment lacks merit.

Jury Instructions

On appeal McKinney asserts that the trial court erred in instructing the jury *742 as to the law of principals, self defense, and negligent homicide. However, it does not appear that an objection was made to the jury instructions as to self defense during the trial. Thus, the right to assign this as error has not been preserved. In State v. Dilosa, 2001-0024 (La.App. 1st Cir.5/9/03), 849 So.2d 657, writ denied, 2003-1601 (La.12/12/03), 860 So.2d 1153 the court stated:
Erroneous instructions or failure to give jury instructions are not errors patent, and absent an objection during the trial, a defendant may not complain on appeal of an allegedly erroneous jury charge or the failure to give a jury instruction. [sSee La.C.Cr. P. arts. 801 C, 841 and 920(2); State v. Tipton, 95-2483, p. 7 (La.App. 1 Cir. 12/29/97), 705 So.2d 1142, 1147. In the present case, the record does not reflect that defendant made a contemporaneous objection to the jury charges on the basis of the alleged failures now asserted in this assignment of error. Accordingly, the issue raised in this assignment of error is not properly preserved for appellate review.
Consequently, the defendant’s assignment of error as to the jury instructions concerning self defense has no merit.
We also find that the defendant’s assignment of error as to the jury instruction concerning principals has no merit. The state points out that the doctrine of transferred intent applies and that the evidence showed there were two other shooters in McKinney’s group.
The law of principals is codified in La. R.S. 14:24, which states,
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or' directly or indirectly counsel or procure another to commit the crime, are principals.
The record reflects that the trial counsel objected to the court giving the jury instruction on the-issue of principals, but the objection was overruled.
The disposition of the cases of other people allegedly involved in the commission of a crime is not a factor in whether or not a defendant can be found to be a principal. In State v. Irvine, 535 So.2d 365 (La.1988), the court noted that,
When a crime has been committed by two principals, it is not necessary to the conviction of one principal that the other alleged principal be tried and convicted. See State v. McAllister, 366 So.2d 1340 (La.1978).
| flMcKinney argues that there was “no evidence that anyone else had the specific intent to kill or inflict great bodily harm on anyone at the time of the shooting and that all intent was directed toward the defendant.” We note that there is no requirement in the law that in order to be guilty as a principal, the state must charge another individual with the same crime. In State v. Gilliam, -36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 2002-3090 (La.il/I4/03, 858 So.2d 422), this court affirmed the first degree murder conviction of the defendant where the evidence revealed that he and two other men repeatedly fired into a car occupied by several individuals, one of whom was a three year old child. • - One of the bullets ’struck and killed the child. The evidence did not conclusively prove that the weapon fired by the defendant killed the child. However, the court concluded that the defendant’s conduct in firing indiscriminately into a vehicle loaded with several people was sufficient to justify his conviction as a principal.
The record shows that McKinney went ■to the Expo Hall with a group of people who purposefully took weapons with them *743 and that all three people from his group indiscriminately fired weapons into the crowd that night. We find that there was no error by the court in overruling the defendant’s objection to this jury instruction.

Jury Instmction-Negligent Homicide

McKinney argues that the trial court allowed the trial counsel to argue negligent homicide to the jury “obviously realizing that there was considerable evidence of defendant’s reckless disregard for the safety of others by firing into a crowd with a semi-automatic weapon, even in selfjdefense.10” He concludes “there was clearly evidence of a negligent use of a weapon, although the defendant was acting in self-defense. Clearly the jury should have been instructed that, if they believe the defendant is guilty of negligent homicide, they should find him not guilty of murder.”
The state argues that the record does not support an accidental shooting, but rather supports a finding of transferred intent since McKinney purposefully fired his weapon in the direction of a group that included the victim. Under La. C. Cr. P. art. 802,
The court shall charge the jury:
(1) As to the law applicable to the case;
(2) That the jury is the judge of the law and of the facts on the question of guilt or innocence, but that it has the duty to accept and to apply the law as given by the court; and
(3) That the jury alone shall determine the weight and credibility of the evidence.
La. C. Cr. P. art. 807 adds that,
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
The trial court is mandated to charge the jury as to the law applicable to the case. Although requested to do so, the trial court refused to add the special instruction on negligent homicide. The record shows the issue was raised during voir dire and the trial court informed the trial attorney that he could question the venire on the concept. The requisite motion was madeJjjlater and was denied with the proviso that the trial attorney could argue negligent homicide in his closing argument. However, McKinney’s argument is unsupported by any evidence that could lead reasonable jurors to a finding of the negligent use of the weapon.
In order to determine if the trial court erred by not including this instruction, this court must decide whether or not a negligent homicide verdict could be supported by the record. The fact scenario suggested by McKinney is the “defendant’s reckless disregard for the safety of others by firing into a crowd with a semi-automatic weapon, even in self-defense.” The definition of negligent homicide and criminal negligence are defined as follows:
La. R.S. 14:32
A. Negligent homicide is the killing of a human being by criminal negligence.
B. The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.
*744 La. R.S. 14:12
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
McKinney cites State v. Williams, 606 So.2d 1387 (La.App. 2d Cir.1992), appeal after new trial, 26,716 (La.App.2d Cir.5/10/95) 658 So.2d 703 rehearing granted (Jun 15, 1995), on rehearing (Jul 27, 1995), writ denied, 95-2175 (La.2/2/96), 666 So.2d 1091. However, the facts in Williams are distinguishable in that the record showed the victim and | ^.defendant “tussled” with the gun prior to the gunshot and that immediately after the shooting the defendant said he thought the safety was on.
In the instant case, no one saw this applicant aim and fire. The record shows that people saw him with a pistol and that he admitted that he shot a pistol. His statement is the only direct evidence that he fired the gun. This court must make inferences from these words — “When I heard the shots, I got paranoid, you know. That’s the reason I got the gun from Elo and I started shooting.” From these words alone we cannot infer whether he was aiming at a particular person or the crowd. However, it is evident from the testimony of people in the crowd, he was shooting toward the opposing group. Moreover, the ballistic tests reveal that he fired in the direction of the victim.
The evidence supports a finding that McKinney purposefully pointed his weapon and fired into a crowd of people. His intent can be inferred from the fact that he opened fire on a crowd of people. His statement to the investigators makes it clear, that he intended to fire the weapon. There was no mistake. No one wrestled with him, the gun did not malfunction, nor did he trip.
The court found that these facts could support a finding of negligent homicide and the trial court should have given the requested jury instructions. That court went on to find, however, that the error was harmless. It found there were enough references in the record for the jury to know that if it found the defendant guilty only of criminal negligence he could not be found guilty of manslaughter.
| ^Consequently, we conclude that this assignment is without merit.
CONCLUSION
For the foregoing reasons, we affirm Edward James McKinney’s conviction and sentence.
AFFIRMED.
BROWN, C.J., concurs with written reasons.